## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE  DIVISION

Thompson, et al                                          Civil Action No. 15-02288

versus                                                   Judge Rebecca F. Doherty

Ackal, et al                                  Magistrate Judge Carol B. Whitehurst


## REPORT AND RECOMMENDATION

Currently pending is a Partial Motion to Dismiss by defendants Emerald Health Care Systems, LLC ("Emerald"), Steve Afeman ("Afeman"), Burt Bujard, M.D. ("Dr. Bujard"), Eva Fontenot, L.P.N. ("Nurse Fontenot"), and Jessica Joe, L.P.N. ("Nurse Joe") (collectively "the Medical Defendants") [Rec. Doc. 26], a Response In Opposition filed by Tyree Thompson, the Administrator on behalf of Yulanda Thompson Succession ("Plaintiff")[1], [Rec. Doc 41], and the Medical Defendant's Reply thereto [Rec. Doc. 46]. The motion was referred to the undersigned for ruling. Oral argument was conducted on January 20, 2016.    For the following reasons, the undersigned will recommend that the motion be granted in part and denied in part.

### I.  Factual Background

Plaintiff alleges claims under 42 U.S.C. § 1983, the American With Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, and state law, for the death of Daquentin Thompson ("Daquentin") while he was in custody at the Iberia Parish Jail ("Iberia Jail"). The following provides the factual allegations in Plaintiffs' Complaint and Amended Complaints.

---

[1] Yolanda Thompson, mother of Daquentin Thompson, filed this action on August 26, 2015. Following her death, Tyree Thompson, her son and administrator of her estate, was substituted as party plaintiff by order entered December 18, 2015. *R. 35.*

Plaintiff alleges, on August 1, 2014, his sixteen year old brother, Daquentin Thompson ("Daquentin"), was seen by his primary care physician at Pediatric Group of Acadiana, who noted that Daquentin was doing well on a combination of Adderall, Vyanase and Vistaril. Thereafter in August 2014, Daquentin was arrested on charges of aggravated rape of a thirty-six year old woman and transported to the Assumption Parish Youth Detention Center ("Youth Center"). On August 2, 2014, upon his intake at the Youth Center, Daquentin's diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD") was noted, however, only his prescription for Visteril was continued. On September 1, 2014, Daquentin attempted suicide by tearing his blanket and wrapping it around his neck. The medical staff at the Youth Center placed Daquentin on suicide watch—"1 on 1 Observation"—for two days.

Following indictment, Daquentin was transferred for housing at the Iberia Parish Correctional Facility ("Iberia Jail") as a pre-trial detainee on September 11, 2014. Upon admission to the Iberia Jail, an Iberia Jail screening officer, Camisha Jackson, performed the medical portion of the Intake Screening. The screening officer did not record that Daquentin had been transferred from the Youth Center or that he had been on suicide watch. Instead, only Daquentin's diagnosis for ADHD and his prescription for Vistaril were recorded. Also, the screening officer designated on the "Intake Booking Division Health Screening Form" that Daquentin's housing disposition was "general population" rather than special housing for a sixteen year old such as Daquentin.

The following day, a nurse provided by Emerald conducted a medical intake summary on Daquentin. Emerald was the provider of medical and mental health care services at the Iberia Jail. Using Emerald's "Treatment Plan, Special Needs and Restrictions" form, designed to note specific housing restrictions, the nurse failed to mark that Daquentin was an "Adolescent in Adult Facility."

2

Also, although Daquentin had signed an authorization to release his medical records from other healthcare institutions, it was never sent to his medical and mental healthcare providers (the Youth Center or Pediatric Group of Acadiana), so none of his medical records were obtained and his prior suicide attempt was not known.

While Dr. Bujard, an Emerald employee and the Medical Director of Iberia Jail, continued Daquentin's prescription for Vistaril by telephone, Dr. Bujard never personally evaluated Daquentin. Nor did a psychiatrist or any other mental health professional ever evaluate Daquentin regarding his attempted suicide nor whether Vistaril was adequate treatment for his disorder.

Plaintiff alleges Daquentin sought help from Jail deputies and Nurse Eva Fontenot, an Iberia Jail nurse employed by Emerald, for his suicidal urges on multiple occasions—two of which, October 21 and 23, 2014 are documented. On October 21, Daquentin told Nurse Fontenot and Deputy Henry that he wanted to kill himself. When Nurse Fontenot asked Daquentin if he had a plan, Lieutenant Leblanc approached the cell. Daquentin told the Lieutenant that "he was just joking." Nurse Fontenot did not refer Daquentin to a mental health provider.

On October 23, Daquentin again told Nurse Fontenot and a different officer, Deputy Hippler, that he wanted to kill himself. When Nurse Fontenot asked if he had a plan, Daquentin told her, "he will hang himself with his jumper and that he scratched his arm." When Nurse Fontenot asked if he was "joking again," Daquentin told her, "no, I just don't want to be on earth anymore." Nurse Fontenot did not refer Daquentin to an appropriate mental health provider or determine that the "scratch" on his arm was an attempt to cut his wrist. Instead, she notified the Jail Sargent, Sgt. Fitch, who offered to speak to Daquentin. Sgt. Fitch reported to Nurse Fontenot that Daquentin was "joking." Plaintiff further alleges that the day before this incident on October 25, 2014, Sgt. Fitch had

entered Daquentin's cell, confiscated all of his property, taunted him and made threats regarding his physical safety. *R. 1, ¶ 34.* Daquentin was found hanging in his cell on October 26, 2014 at approximately 12:30 a.m. He was declared dead at Iberia Parish Medical Center at 1:25 a.m.

Plaintiff alleges that the interactions between Daquentin and the Jail staff were consistent with a pattern and practice of excessive force at the Iberia Jail. He alleges, in 2011, a 62- year-old man with a history of mental illness died of a traumatic brain injury after deputies used force on him in a holding cell. Plaintiff specifically alleges Sgt. Fitch and Lt. Blanchard were directly involved in the incident. Also in 2011, Plaintiff alleges Curtis Ozenne was kicked, threatened with dogs, held in stress positions, and was beaten with a baton in the Chapel. Plaintiff further alleges the Chapel was used to inflict excessive force because it was not covered by video cameras. Finally, Plaintiff alleges that in 2009, Michael Jones, a mentally ill man, died after use of excessive force by the Warden and a Lieutenant.[2] *R. 1, ¶ 35.*

Plaintiff filed this action on August 26, 2015 against the Iberia Parish Sheriff and various officers at the Iberia Jail, Iberia Parish, and the Medical Defendants alleging the Medical Defendants' deliberate indifference to Daquentin's mental health needs violated his right to due process and to be free from cruel and unusual punishment under the Fourteenth Amendment to the U.S. Constitution. In his Reply memorandum, Plaintiff agrees that his claims against Steve Afeman as well as his ADA and Rehabilitation Act claims against Emerald, Dr. Bujard, Nurse Fontenot and Nurse Joe (Counts 5 and 6), should be dismissed with prejudice. The Court will therefore dismiss these claims as well as defendant, Steve Afeman. Also, in the Summary Chart Plaintiff indicates medical malpractice

---

[2] The Iberia Jail's Agreement with Emerald to provide healthcare is dated January 16, 2011.

claims against Emerald, Frederick and Joe, however, the only defendant he has filed such claim against is Dr. Bujard. The Court will consider Plaintiff's medical malpractice claim only as to Dr. Bujard.

Thus, Plaintiff alleges the foregoing "constellation of facts" undermine the following claims against the remaining Medical Defendants: (1) Count 2—§1983 claims based on failure to supervise against Dr. Bujard and Nurse Joe, in their official capacities; (2) Count 3—§ 1983 claims based on Deliberate Indifference to Daquentin Thompson's Mental Health Needs and Suicide Threats against Bujard and Fontenot[3]; (3) Count 7—§ 1983 *Monell* claim against Emerald; (4) Count 8—State law Medical Malpractice claim against Bujard; (5) Count 9—State law claim of *Respondeat Superior* Liability against Emerald.

During the January 21, 2016 hearing on oral argument of the Medical Defendant's motion at bar, the Court granted Plaintiff's oral motion to amend the Complaint. On January 25, 2016, Plaintiff filed a Second Amended Complaint attaching the Agreement For General Health Services between Emerald, Iberia Parish Government and Iberia Parish Sheriff, executed by all parties on January 14, 2011 ("Agreement"). *R. 51, Exh. A.*

The Medical Defendants move to dismiss all of Plaintiff's claims against them on the basis that they are substantively or procedurally deficient and/or fail to state a claim upon which relief may be granted, and therefore, must be dismissed. In particular, they state that Counts 2,3,5,6 and 7 fail

---

[3] Plaintiff indicates in the summary attached to his Reply that he has a claim against Amanda Frederick under Court 3. While Plaintiff named Frederick as a defendant in his Complaint, she has not been served and is not presently a party-defendant. The Court will not consider any allegations against Frederick.

to state claims against the Medical Defendants and Count 8 fails to state a claim against Dr. Bujard.[4]

The  Medical Defendants' motion includes exhibits that are not attached to the pleadings.  In considering a motion to dismiss, a court must ordinarily limit itself to the contents of the pleadings and attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Documents that a defendant attaches to a motion to dismiss are [also] considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id*. "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins*, 224 F.3d at 499. These are documents presumably whose authenticity no party questions.[5]

Here the Medical Defendants have attached as exhibits to the motion a copy of the Agreement, which is attached to  Plaintiff's Second Amended Complaint, as well as copies of an Intake Booking Division Health Screening Form and an Intake Summary. *R. 26-2.* Even if the Agreement was not part of the pleadings, it assists in establishing the basis of Plaintiff's case and would properly be considered by the Court. The other documents do not. While they are mentioned in the pleadings, they are not essential to the basis of Plaintiff's suit. More importantly, they are not self-authenticating. The

---

[4] The Medical Defendants correctly contend §1983 does not recognize a claim for *Respondeat Superior*. They do not address Count 9, the state law claim of *Respondeat Superior*.

[5] "Rule 12(b) grants a court discretion to accept and consider those materials in its ruling on the motion, but does not require it to do so. A court exercises this discretion by determining whether the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate disposing of the action. If the court decides to consider such extraneous material, then the court must treat the Rule 12(b)(6) motion as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). If the court refuses to consider those materials outside the pleadings, then the Rule 12(b)(6) motion remains intact and may be decided on its merits under the appropriate standard of review." *Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179 (S.D. Tex. 2008). (J. Rosenthal)

undersigned will not consider these documents in its analysis.

*II.  Motion To Dismiss Standard*

A motion to dismiss for failure to state a claim, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001). When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a district court must limit itself to the contents of the pleadings, including any attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000). The court must accept all well-pleaded facts as true, and it must view them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir.2007) . However, conclusory allegations and unwarranted deductions of fact are not accepted as true, *Collins*, 224 F.3d at 498, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The allegations must be sufficient "to raise a right to relief above the speculative level," *Id. at 555,* and "the pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action," *Id.* "While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* If the plaintiff fails to allege facts sufficient to "nudge[ ][his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

A claim meets the test for facial plausibility "when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Therefore, "[t]he complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir.2009).

### *III. Analysis*

Count's 1 – 7 of Plaintiff's claims are brought under 42 U.S.C. § 1983. To state a claim pursuant to § 1983, a plaintiff must claim a violation of a right secured by the Constitution or laws of the United States and demonstrate the alleged deprivation was committed by a person acting under color of state law. *See* 42 U.S.C. § 1983. Plaintiff argues that the Medical Defendants acted under color of state law to deprive Daquentin of his due process right to adequate health care under the Fourteenth Amendment and the Eighth Amendment by acting with deliberate indifference to Daquentin's medical and mental health needs thereby causing his death.

The right of convicted prisoners not to have serious medical needs treated with deliberate indifference was established in *Estelle v. Gamble*. *Burns v. City of Galveston*, 905 F.2d 100, 103 (5th Cir.1990) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). *Gamble* holds that deliberate indifference to serious medical needs of prisoners constitutes "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Gamble* applied this standard of medical care to prisoners who had actually been convicted. A pretrial detainee like Daquentin, however, has a Fourteenth Amendment Due Process right to be free from punishment altogether. *Cupit v. Jones*, 835 F.2d 82,

8

85 (5ᵗʰ Cir.1987) ( "while a sentenced inmate may be punished in any fashion not cruel and unusual, the due process clause forbids punishment of a person held in custody awaiting trial but not yet adjudged guilty of any crime.").

According to the face of the pleading, the Constitutional rights implicated in this case include a pretrial detainee's (1) right to medical and mental health care; and (2) right to protection from self-harm. Each of these rights are well-established. "Pretrial detainees have a constitutional right not to have confining officials treat their serious medical needs with deliberate indifference, under the Due Process Clause of the Fourteenth Amendment. *Estate of Allison v. Wansley*, 524 Fed.Appx. 963 (5ᵗʰ Cir. 2013).

*A. Plaintiff's Monell Claims*

*1. Failure to Supervise/Train Claims against Dr. Bujard and Nurse Joe in Their Official Capacities*

Plaintiff alleges that Emerald is liable for deliberate indifference to Daquentin's mental health needs under § 1983.  The Fifth Circuit has indicated that a corporation can be liable under § 1983 if there is a showing of official sanction or "imprimatur" of the conduct or practice at issue. *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 602 n. 3 (5ᵗʰ Cir.1988). The Health Services Agreement between Emerald and the Iberia Jail provides that Emerald is the policymaker for healthcare at the Jail. *R. 51-1.*

Private corporations cannot be vicariously liable for its employees pursuant to section 1983 because there is no *respondeat superior* liability under this statute. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 691-94 (1978). The test to determine liability for a private prison-management corporation under § 1983 is more or less identical to the test employed to determine municipal or local government liability. *See Phillips v. Corrections Corp. of America*, No. 02–766, 2006 WL 1308142 at *3 (W.D.La. May 10, 2006); see also *Monell*, 436 U.S. at 694. To hold

a private corporation performing a government function liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that (1) there is a policymaker who could be held responsible, through actual or constructive knowledge, for enforcing a policy or custom that caused the claimed injury; (2) the corporation has an official custom or policy which could subject it to § 1983 liability; and (3) the claimant can demonstrate that the corporate action was taken with the requisite degree of culpability, and show a direct causal link between the action and the deprivation of federal rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.2001).

Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id*. at 579. A policy is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989).

Plaintiffs allege that Dr. Bujard as the Medical Director for Emerald and Nurse Joe as Emerald's Director of Nursing and Health Services Administrator, both acting as Emerald's policymakers at the Iberia Jail, were deliberately indifferent to the need for proper training and supervision with regard to mental health care at the Jail. The Medical Defendants argue that Sheriff Ackal is the only final policy maker for the jail under Louisiana law.

In his Second Amended Complaint, Plaintiff attaches the Health Services Agreement which provides Emerald's responsibilities under the terms of the Agreement as follows:

1. Emerald will provide for and deliver Health Services to the Inmates at the [Iberia] Jail.

10

      2. Emerald will design and implement written policies, procedures, and protocol for the Health services Unit and will provide the Jail Warden copies of written policies, procedures and protocol.

      3. Emerald will staff, plan, implement, direct and control all clinical and administrative aspects of the Health Services program.

*R. 51-1, § V.* The Agreement further states that Emerald "will provide Health Services employee training" to all medical staff as well as Jail personnel. *Id. at § V, C.* In particular, the Agreement states that Emerald's personnel "will perform the Medical portion of the Intake screening" in order to "identify immediate medical needs, to include inquiry into all aspects of health care...." *Id. at § V, F.* Finally, the Agreement provides that "Emerald will complete an initial Health Assessment on each Inmate" which entails "an examination, structured interview and review of past medical history, records and tests to determine an Inmate's health status." *Id. at § V, G.* The Agreement specifically identifies "Emerald corporate staff" as "the Physician" and/or "the Jail's Medical Director" and "the Director of Nursing" and/or "the Health Services Administrator" and states that they "are available twenty-four hours a day, seven days a week ... at all times." *Id. at § V, B.* Plaintiff alleges that Dr. Bujard was employed by Emerald as the Jail's Physician and Medical Director and was a final policymaker regarding Emerald's policies and practices. *R. 1, ¶ 14.* Plaintiff further alleges that Nurse Joe was employed as the Jail's Director of Nursing and Health Services Administrator. *R. 1, ¶ 12.*

      Based on the foregoing Agreement, Plaintiff alleges that the Iberia Parish Sheriff delegated specific supervising, training, and policy making authority with regard to medical care to Emerald, and that Emerald conveyed the policy making and supervisory authority at the Jail to Dr. Bujard and Nurse Joe. Thus, Plaintiff alleges, Bujard and Joe have final policy making authority though the Sheriff's delegation. For purposes of surviving a motion to dismiss, Plaintiff has made a sufficient showing that Bujard and Fontenot were the kind of "higher ranking officials with policymaking authority" whose actions could be attributed to the corporation.

Plaintiff relies upon theories of supervisory liability, including failure to train and failure to supervise. Even when a supervisor is not personally involved in a constitutional violation, a supervisor may be held liable for failure to train or supervise subordinates if: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of rights; and (3) the failure to train or supervise amounts to deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir.2011).

Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Even under the objective standard, liability requires more than unintentional negligent oversight or even gross negligence; there must be a deliberate choice. *City of Canton*, 489 U.S. at 388, n. 7; *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010). A claimant, however, need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825 (1994).

Both parties agree, and the case law is clear, that the relevant standard of culpability for such supervisory liability is deliberate indifference. However, the parties disagree on whether it is a subjective or objective deliberate indifference standard. The Medical Defendants argue that it is the subjective deliberate indifference standard set forth in *Farmer* for direct violations of due process.[6] Plaintiffs argue that it is the objective deliberate indifference standard set forth in *City of Canton v. Harris*,489 U.S. 378, 381 (1989)*,* for determining whether a municipality may be liable for a

---

[6] In *Farmer*, the Supreme Court held that the appropriate standard of deliberate indifference for violations of the Eighth Amendment was subjective deliberate indifference. *Id*. at 837.

subordinate's underlying constitutional violation.[7] Plaintiffs contend that, under *Canton*, individual supervisory liability may arise where there has been a pattern or practice of the same or similar violations in the past or, in the case of a single violation, where the risk of harm was obvious.

The Fifth Circuit has explained this dual standard in the context of municipal liability:

> We separate the two issues: the existence of a constitutional violation simpliciter and a municipality's liability for that violation. Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with *subjective* deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. *See Farmer*, 511 U.S. at 825 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

*Hare v. City of Corinth*, 74 F.3d 633, 649 n. 4 (5th Cir.1996) (emphasis in original); *see also Lawson v. Dallas Cnty*., 286 F.3d 257, 264 (5th Cir.2002) ("Unlike the deliberate indifference standard applied to individual employees, this standard [for municipal deliberate indifference] is an objective one; it

---

[7] In *City of Canton v. Harris*, the plaintiff's claim was premised on a failure to train. The Supreme Court held that a municipality is responsible in certain circumstances under § 1983 for a failure to train its employees only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *Id*. at 388. The Court explained, however, that such liability, predicated on a violation of the plaintiff's right under the Due Process Clause of the Fourteenth Amendment, depends on a showing of (1) a "deliberately indifferent" policy of training that (2) was the "closely related" cause of the violation of the plaintiff's federally protected rights. *Id*. at 388.

The Court further stated, "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id*. The focus "must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id*.

considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights.").

In *Doe v. Taylor Independent School Dist.*, 15 F.3d 443 (5th Cir. 1994), the Fifth Circuit considered a supervisor's liability. The *Doe* court held that the same standard for assessing municipal liability for failure to train or supervise (the *Canton* standard) applies  to individual supervisory liability for failure to supervise. *See id.* Since both the Supreme Court and the Fifth Circuit recognize that the *Canton* standard is an objective standard, it appears that the Fifth Circuit would apply the objective deliberate indifference standard to claims against the individual supervisors, such as Bujard and Joe, for failure to train or supervise.

Here, Plaintiff alleges that Daquentin, a 16 year old minor, was subjected to supervisory and training violations and failures by the Emerald staff upon entering the Iberia Jail until his death by suicide. Those failures included inaccuracies in the completion of intake and medical screening forms as to Daquentin's mental health and failure to secure and review his medical records prior to making treatment decisions. Most significantly, Plaintiff alleges, the supervisory and training violations resulted in the failure to act on Daquentin's repeated threats of suicide (which also included a suicidal gesture—a cut on his arm) or conduct any follow up investigation to confirm Daquentin actually "was joking," and to ensure that he saw a qualified mental health professional after the repeated threats of suicide.

Plaintiff further alleges that the Medical Defendants, through Dr. Bujard and Nurse Fontenot, were aware that, despite his youth and diagnosed mental illness, "Daquentin was subjected to harsh, punitive, and unlawful conditions at the jail.... housing with adult inmates, including inmates with jail disciplinary problems; suffering through twenty-three-hour-a-day lock down in his cell, with no opportunity for education or recreation; and being forced to wear a bright pink jump suit, stare at

14

bright pink walls and sleep in bright pink bedding, all or which was specifically designed to humiliate and degrade the detainees in the area where Daquentin was held." *R. 1, ¶¶ 30, 31, 32.* Rather than being referred to the mental health staff, however, Nurse Fontenot referred Daquentin to the very jail officials who had allegedly taunted him.

Plaintiff alleges that two other deaths occurred in the Iberia Jail in 2011, while the Emerald Agreement was in place, one involving a detainee with mental issues. The Medical Defendants argue, however, that Plaintiff's claim must fail because he has not alleged a pattern of acts similar to the circumstances lead to Daquentin's death that would have put Dr. Bujard on notice. While a showing of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights, *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir.2008), a limited exception for single-incident liability exists "where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular  policy or failure to train." *Id.*

In *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182 (5th Cir.1986), the Fifth Circuit considered the viability of a section 1983 complaint arising from the suicide of a pretrial detainee. There, a boy who exhibited agitation and aberrant behavior when arrested for burglary and theft and who had previously had a nervous breakdown, a fact communicated to the arresting officer, committed suicide shortly after being placed in solitary confinement. In reversing the dismissal of the complaint, Judge Wisdom, writing for the majority, stated that "the defendants had a duty, at a minimum, not to be deliberately indifferent to [the detainee's] serious medical needs." *Id.* at 1187. He continued:

> A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal

tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective, failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation.

*Id*.

The principal theory of the complaint in *Partridge* was that the boy's death was "caused by the detention center's custom or policy of allowing jail procedures that are callous to the point of deliberate indifference to detainees, especially detainees in need of protection from injuring themselves or others." *Id*. at 1185. The court held that "to the extent that the claim rests on the detention center's deliberate and systematic lack of adequate care for detainees, it alleges the kind of arbitrariness and abuse of power that is preserved as a component of the due process clause...." *Id*. at 1187.

In a similar case in the Seventh Circuit, *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004), the court upheld a jury verdict based on a § 1983 failure-to-train claim and *Monell* violation against a prison health company that had failed to properly treat an inmate who died of suicide. There, as alleged in this case, the employees of the defendant company failed to properly complete intake forms for the decedent at the jail; failed to review the decedent's medical records prior to making treatment decisions; and failed to act on the decedent's repeated threats of suicide, including by failing to ensure that the decedent saw a qualified mental health professional in a timely fashion. *Id.* at 925. The court rejected the defendant's argument that plaintiff's failure to train/supervise claim should be dismissed based on the absence of prior suicides at the jail. Stating that the defendant company did not get a "one free suicide pass," the court held,

> [T]here was a direct link between [the defendant's] policies and [the decedent's] suicide. That no one in the past committed suicide simply shows that [the defendant company] was fortunate, not that it wasn't deliberately indifferent.

*Id.* at 929.

16

Accepting the factual allegations in Plaintiff's Complaint as true and viewing them in the light must favorable to Plaintiff, and after applying the foregoing law, the undersigned finds that Plaintiff has pled enough facts to state a plausible claim that Dr. Bujard and Nurse Joe, in their official capacities as Emerald's policymakers at the Iberia Jail, were deliberately indifferent to the need for proper training and supervision with regard to adequate mental health care of detainees such as Daquentin.

*2. Plaintiff's Monell Claim Against Emerald*

Plaintiff also argues that Emerald is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), for deliberate indifference to a policy, pattern or practice that caused a deprivation of Daquentin's rights. Plaintiff charges that Daquentin's death was the direct result of Emerald's deliberate indifference toward his mental health needs.  A plaintiff may demonstrate municipal or private company liability based on: (1) a formally adopted municipal policy; (2) an informal custom or practice; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; or (4) a single act by an official with final policymaking authority. *Monell*, 436 U.S. at 694.

Plaintiff alleges that Emerald is liable under *Monell* for its failure to train/supervise and for unconstitutional polices/practices based on its alleged knowledge of the incidences involving Daquentin, as provided in the foregoing analysis. Plaintiff has alleged specific facts regarding deficiencies in Emerald's practice of providing "very limited routine mental health services to Inmates" with only "eight hours per week of a Mental Health Worker, who will assist Health Services Staff in assessment and referral of identified Inmates to offsite mental health services." *R. 51-1,* ¶ Q. The staffing plan appended to the contract indicates a position for one mental health worker, one day per week. *Id.* at ¶ B. 4. Neither the contract nor the staffing plan sets forth the licensing requirements

17

required to serve as Emerald's Mental Health Worker. Nor is there any indication that any party to the contract determined if one person working eight hours per week could provide constitutionally adequate mental health care to detainees at the Iberia Jail. The Medical Defendant concede that Nurse Fontenot was an L.P.N. and was not trained to provide mental health care. *R. 26*.

Courts have held that a plaintiff states a claim for a *Monell* violation where he alleges a policy of failing to adequately staff a facility with individuals capable of monitoring and responding to serious medical needs. In *Colle v. Brazos County, Tex*., 981 F.2d 237, 245 (5th Cir. 1993)*,* the plaintiffs alleged that a detainee's death was the direct result of the County's deliberate indifference toward his medical needs. The Fifth Circuit found that a policy maker's failure to staff the jail with persons who had the authority to transfer a detainee to the hospital and/or to monitor the serious health needs of detainees "could support an inference that unconstitutional county policies were the 'moving force' behind the carelessness that led to the detainee's death" under *Monell*. *Id.* at 246. The court held that because Plaintiffs' facts "set the stage for further discovery" they had adequately stated a claim against the County.  *Id.*

Plaintiff alleges in his Complaint that one part-time mental health care worker, as provided by Emerald's Health Care Services Agreement, could not provide constitutionally adequate care for the detainees in the Iberia Jail. Plaintiff further alleges that Emerald's policy and pattern of inadequate mental health staffing contributed to Daquentin's inadequate mental health care. The factual allegations provide that Daquentin spent over a month at the Iberia Jail. Despite Daquentin's diagnosis of mental illness and repeated threats of suicide, he was never evaluated by or referred to a qualified mental health worker. Instead, the Emerald L.P.N., Nurse Fontenot, referred him to non-medical, untrained security staff members on each occasion. Plaintiff alleges at least one prior incident of the death of a detainee with mental illness occurring under the Emerald Agreement.

18

Construing the factual allegations of the Complaint in the light most favorable to him, Plaintiff has pled a plausible *Monell* claim against Emerald.

*B. Plaintiff's § 1983 Claims Against Dr. Bujard and Nurse Fontenot in Their Individual Capacities*

Plaintiff further alleges  that Dr. Bujard's and Nurse Fontenot's treatment of Daquentin violated his right for psychiatric and psychological treatment. The Medical Defendants assert that the pleadings are factually insufficient to sustain liability against Bujard and Fontenot in their individual capacities on any constitutional violations.  They argue that Plaintiff cannot establish the requisite deliberate indifference nor overcome the Medical Defendants' qualified immunity in order to hold them liable in their individual capacities.

When, as here, a pretrial detainee brings medical care claims which are directed toward a particular incident or omission, these claims are properly analyzed as an episodic–act–or– omission, and the deliberate indifference standard is applied. *Hare*, 74 F.3d at 644. In *Farmer*, the Supreme Court considered a prisoner's claim for deliberate indifference under the Eighth Amendment that prison officials transferred or placed the inmate in its general population despite knowledge that the prison had a violent history of inmate assaults and despite knowledge that the inmate, a transsexual, would be particularly vulnerable to sexual attack by other inmates. The Court held that the appropriate standard of deliberate indifference for violations of the Eighth Amendment was subjective deliberate indifference. The Fifth Circuit has adopted the *Farmer* subjective deliberate indifference standard to measure the duty owed to pretrial detainees under the Due Process Clause. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648 (5th Cir.1996). Under the subjective deliberate indifference standard,  "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer* at 837. Although the court may infer deliberate indifference from the fact that the risk was obvious, the defendant may eliminate

19

liability by showing that the obviousness escaped him. *Id*. at 842–43 & n. 8.

The Medical Defendants argue that Plaintiff's claims based on individual liability fail because: (1) Nurse Fontenot acted on Daquentin's suicide threats by informing the Jail staff; (2) Nurse Fontenot did not perceive that a substantial risk of serious harm existed because she was not trained in mental health and could not diagnose Daquentin as suicidal; and, (3) there is no allegation that Dr. Bujard had personal knowledge of Daquentin's suicide risk.

*1. Nurse Fontenot*

Plaintiff alleges that Nurse Fontenot knew of and effectively disregarded a substantial risk to Daquentin's physical and mental health when she failed to refer him to a mental health worker or seek any sort of appropriate mental/medical care of him after he voiced his suicidal intentions to her on at least two occasions. Plaintiff cites *Rodrigue v. Morehouse Detention Center*, 2012 WL 4483438 (W.D.La.,2012) for its holding that an LPN who is not qualified to make medical diagnoses cannot fail to refer an inmate to a qualified medical professional where there are serious medical risks involved. The *Rodrique* court stated in pertinent part:

> At the outset, it is important to specify that the question is not whether Nurse Grayson is liable for failing to recognize that Rodrigue had acute appendicitis. As previously discussed, a LPN is not authorized to make a diagnosis. However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care. LPN Grayson knew that Rodrigue's complaints showed that he was at risk of serious harm. She simply decided not to respond to that risk. This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision... In this case, despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week, a prisoner was simply denied access to a medical professional competent to diagnose and treat his condition. The Court is convinced that this conduct rose to the level of a wanton disregard for Rodrigue's serious medical needs... When a gatekeeper to emergency care, like LPN Grayson, knowingly disregards a prisoner's complaints, she acts with deliberate indifference to that prison's medical needs.

*Id.*, 2012 WL 4483438, at *6.

Here, Nurse Fontenot was the only Emerald staff member who allegedly interacted with Daquentin after his medical screening, and was therefore his "gatekeeper" for access to the mental health staff or to Dr. Bufard. While the Medical Defendants contend she was not competent to evaluate Daquentin as to his reports of suicidal thoughts, Fontenot had an obligation to refer him to a medical professional competent to do so. Despite two separate instances in which Daquentin told her he wanted to kill himself, Fontenot referred Daquentin only to untrained Jail personnel. "A LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care." *Id.* That Fontenot allegedly decided not to refer Daquentin to the mental health care staff member or even consult with an Emerald healthcare provider about his threats of suicide evidences her intentional failure to respond to that risk. Also, Fontenot had allegedly observed Daquentin's discomfort in speaking with security personnel about his thoughts of suicide (he had retracted his statement upon being confronted by the Jail staff), yet she again referred him to a Jail officer upon him telling her the second time that he wanted to kill himself and even had a plan to do it. Thus, Plaintiff has adequately stated a claim that Fontenot was deliberately indifferent to Daquentin's risk of suicide and need for mental health care.

*2. Dr. Bujard*

Plaintiff has also stated a claim for subjective deliberate indifference against Dr. Bujard. The Medical Defendants argue that Dr. Bujard was completely uninvolved in Daquentin's case and had no knowledge of his suicidal history. Plaintiff alleges however, that Dr. Bujard was aware that Daquentin was a 16 year-old with a diagnosed mental disorder (ADHD) which required prescription medication, who was being held in an adult facility. *R. 1, ¶¶ 27, 28*. Dr. Bujard was aware of this because he ordered a refill of Daquentin's medication, Vistaril. Despite providing Daquentin with prescription medication, Dr. Bujard never personally examined him, never obtained his medical

records related to the medication and never spoke with him about his condition. Had he done any of these things before making the treatment decision to continue the Vistaril, he could have learned that Daquentin had a history of serious mental illness; was not taking the medications he had been prescribed for his mental illness; and, had tried to commit suicide at the Youth Center where he was detained before the Iberia Jail. Based on the foregoing allegations, Plaintiff has alleged a plausible claim that Dr. Bujard's treatment of Daquentin without ever examining him or his medical records constituted deliberate indifference. *See e.g. Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 924 (7th Cir. 2008) (it was deliberate indifference for the mental health official to make treatment decisions without examining the inmate's records); *Davis v. Puryear*, 673 So.2d 1298 (La.App. 4 Cir.,1996) (Psychiatrist was negligent for failing to obtain psychotic patient's medical records before patient committed murder).

*3. Qualified Immunity*

The Medical Defendants contend that Dr. Bujard and Nurse Fontenot are entitled to qualified immunity. Both parties agree that the Medical Defendants were acting under color of state law for the 1983 action,[8] however, the Medical Defendants' claims of qualified immunity present a more complicated question than suggested in their brief. As asserted by Plaintiff, in *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court held that private employees of a private company may not be entitled to assert the qualified immunity defense, even where the employees are performing traditional state functions that subject them to liability under § 1983. In *Richardson* a private company was hired by the state to supply private guards at a prison under private operation. The Supreme Court held that such privately employed prison guards could not assert qualified

---

[8] The Supreme Court, however, has held that "[t]o act 'under color' of law does not require that the accused be an officer of the state." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

immunity. The Court noted, to determine whether prison guards employed by a private corporation were entitled to qualified immunity the Court would "look both to history and to the purposes that underlie government employee immunity." *Id.* at 404.

Since *Richardson*, courts determining whether or not an employee of a private contractor that is acting under color of state law may assert qualified immunity have conducted a fact-intensive analysis under which some employees may be permitted to assert qualified immunity and some may not. Plaintiff represents there is no Fifth Circuit case which addresses the question of whether privately employed medical personnel who work with prisoners, such as the Medical Defendants in this case, are entitled to qualified immunity.[9] Plaintiff cites *Cheek v. Nueces County Tex.*, 2013 WL 4017132, at *1 (S.D.Tex.,2013)*,* in support of his position that the Medical Defendants are not entitled to qualified immunity.

The facts of *Cheek* are analogous to this case in that only the mental health and medical part of the prison operation was in private hands, rather that the entire prison as in *Richardson*. Based on that distinction, the district court considered "the reasoning of *Richardson* in the narrower context of medical services and the application of those principles to the scope of services provided and the amount of governmental supervision at issue." *Id.* at *22. In concluding that private medical personnel who provide services to pretrial detainees are not entitled to qualified immunity, the court held there was no material difference between the private medical providers and the private guards in *Richardson. Id.*

As in *Richardson*, the *Cheek* court concluded that the private medical defendants did

_____

[9] The Medical Defendants refute Plaintiff's representation that the Fifth Circuit has not addressed the issue at bar. They cite *Bishop v. Karney*, 408 Fed. App'x 846 (5th Cir. 2011), an unpublished per curium decision in which the court held that a private psychiatrist who worked for the state to provide medical care to prisoners had qualified immunity. The *Bishop* court, however, did not address *Richardson* nor did it make any analysis of the private contractor issue.

not have the "most important special government immunity-producing concern—unwarranted timidity" because the medical defendants had entered into a competitive contract and were part of a large corporation organized to perform the specific work entrusted to it independently and without government supervision of the day-to-day work. *Cheek*, 2013 WL 4017132, at *22 (citing *Richardson*, 521 U.S. at 409). The *Cheek* court further concluded that "'privatization' helps to meet the immunity-related need 'to ensure that talented candidates' are 'not deterred by the threat of damages suits from entering public service'" and the medical defendants do not have the governmental worker's need for immunity to avoid distraction from the work being done in the course of their governmental term. *Id.* at *23 (citing *Richardson* at 411). Finally, the court concluded, because "prison-related operations, historically, have not always been exclusively governmental.... the underlying bases for the development of qualified immunity indicates that it should not protect the private delivery of health care to prisoners." *Cheek* at *23.

Based on the foregoing and after analyzing the various Circuit cases that have addressed the issue since *Richardson*, the *Cheek* court concluded that the private medical personnel who provided services to pretrial detainees in that case were not entitled to qualified immunity.  *Id.* at *24 (citing *Harrison v. Ash*, 539 F.3d 510, 521–25 (6th Cir.2008) (prison nurses employed by a private medical provider may not assert qualified immunity); *Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163, 1169 (10th Cir.2005) (applying "market forces" element to deny qualified immunity to non-profit organization supplying services to the developmentally disabled under government contract); *Jensen v. Lane County*, 222 F.3d 570, 579 (9th Cir.2000) (denying qualified immunity to contract psychiatrist); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir.1999), amended, 205 F.3d 1264 (11th Cir.2000) (finding no reason to distinguish privately employed physicians from privately employed prison guards and denying qualified immunity; withdrawing any opinion on the

merits of the constitutional claim); *Halvorsen v. Baird*, 146 F.3d 680, 685–86 (9th Cir.1998)

(non-profit detoxification facility not entitled to qualified immunity).[10]

Recently, in *McCullum v. Tepe*, 693 F.3d 696 (6th Cir.2012), the Sixth Circuit called its earlier

*Harrison, supra*, decision into doubt, criticizing its cursory treatment of the question of historical

immunity. Then, after a more extensive investigation into the history of physician liability, concluded

that the *Harrison* holding was correct, there was no historical immunity for doctors in the common

law, and no qualified immunity should now apply simply because doctors work pursuant to a

government contract. *Cheek*, at *24.

Finally, the *Cheek* court noted, "[w]hile the Fifth Circuit has cited *Richardson* on a number

of occasions, none of those cases have squarely addressed the question of whether privately employed

medical personnel who work with prisoners are entitled to qualified immunity. *See generally, United

States v. Thomas*, 240 F.3d 445, 448 (5th Cir.2001)(whether a guard at a private prison was a "public

official" for purposes of 18 U.S.C. § 201 bribery statute); *Walter v. Horseshoe Entertainment*, 483

Fed. Appx. 884, 886 (5th Cir.2012) (consideration of whether casino security officer was entitled to

qualified immunity was barred by the *Heck* rule); *United States ex rel. Barron v. Deloitte & Touche,

L.L.P.*, 381 F.3d 438, 443 (5th Cir.2004)(addressing Eleventh Amendment immunity); *Rosborough

v. Management & Training Corp.*, 350 F.3d 459, 460 (5th Cir.2003)(agreeing with the Sixth Circuit

that private prison-management corporations and employees may be sued under § 1983); *Bazan ex

rel. Bazan v. Hidalgo County,* 246 F.3d 481, 488 (5th Cir.2001)(qualified immunity of police officer)."

---

[10] *Harrison* and *Hinson* each found that while state actor physicians may have had common law immunity for negligence, they had none for intentional harm (including deliberate indifference). *See Harrison*, 539 F.3d at 522-25; *Hinson*, 192 F.3d at 1345-47. In *Jensen*, the court found an insufficient historical basis for granting immunity due to "[t]he paucity of federal case law" and because Oregon's statutory immunity for committals did not suggest a firmly rooted tradition. *See Jensen*, 922 F. 3d 579, 576 n.2; *see id.* at 576-77.

*Id.*

The court's analysis in *Cheek*, as well as the opinions of other circuits that deny qualified immunity in similar circumstances weigh heavily against finding that the Medical Defendants are entitled to the defense of qualified immunity. *Richardson* directs that the Court must conduct a fact-intensive analysis in order to determine whether or not the Medical Defendants are entitled to assert qualified immunity. Such an analysis is not appropriate under this Rule 12(b)(6) motion.

*C. State Law Medical Malpractice Claim Against Dr. Bujard*

In Count 8 of his Complaint, Plaintiff alleges a medical malpractice claim against Dr. Bujard. Plaintiff contends the state-mandated medical review process is pending with regard to the claim. Under the provisions of the Louisiana Medical Malpractice Act ("MMA") at La. R.S. 40:1299.47, "No action against a health care provider ... may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel..." La. R.S. 40:1299.47(B)(a)(1); *Derouen v. Kolb*, 397 So.2d 791 (La 1981). One treatise has observed that when a plaintiff files a premature medical malpractice claim, that claim is subject to dismissal without prejudice.[11] "Medical malpractice review panel provisions of state laws are substantive rules of law of the forum which must be applied by a federal court in a diversity case." *Seoane v. Ortho Pharmaceuticals, Inc.*, 472 F.Supp. 468, 471 (E.D. La., 1979).

The Medical Defendants assert that the only appropriate remedy is to dismiss Plaintiff's claims against Bujard under 12(b)(6) because Plaintiff has failed to allege the completion of the medical review panel process. Plaintiff does not dispute the statutory necessity for the medical review

---

[11] William E. Crawford, 12 La. Civ. L. Treatise, Tort Law § 15:2 (2d ed.) ("Failure to have the opinion of the medical review panel prior to filing suit subjects the plaintiff's action to an exception of prematurity. A dismissal for prematurity is without prejudice, as though the suit were never filed, which may subject the action to a valid plea of prescription. The exception of prematurity is not a prerequisite for dismissal.").

panel's determination of the claims pertaining to Dr. Bujard's medical malpractice. He contends, however, that dismissal of all claims against Dr. Bujard or a complete stay of the case will prejudice Plaintiff by impeding discovery efforts and delaying timely resolution of the claim, requiring the payment of costs necessary for two separate trials regarding the same events.

Plaintiff argues the claims against Bujard should not be entirely dismissed because constitutional/Due Process claims against him have also been alleged in the pleadings. Since those claims are not under the purview of the MMA, they should not be deemed premature. Plaintiff seeks a partial stay or dismissal without prejudice of only the medical malpractice portion of the case pending completion of the medical review panel.

As plaintiff has alleged a medical malpractice claim against Bujard before completion of the medical review panel,  the medical malpractice claim against him must be dismissed as premature. Plaintiff's § 1983 claims against Bujard remain pending. The undersigned will therefore recommend that plaintiff's medical malpractice claim against Dr. Bujard be dismissed without prejudice as premature. *See Suffal v. Parish,* 2015 WL 631452, at *2 (E.D.La.,2015) (J. Milazzo) (dismissing without prejudice plaintiff's medical malpractice claim against defendant and retaining the § 1983 claims against defendant); *see also Mays v. Bracey,* 2013 WL 450156 (W.D. La. 2013) (J. Stagg).

### Conclusion and Recommendation

For the reasons set out above, it is the recommendation of the undersigned that the motion to dismiss filed by defendants Emerald, Steve Afeman, Dr. Bujard, Nurse Fontenot, and Nurse Joe [Rec. Doc. 21] be **GRANTED IN PART** in that (1) Plaintiff's claims against Steve Afeman, and (2) Plaintiff's ADA and Rehabilitation Act claims against Emerald, Dr. Bujard, Nurse Fontenot and Nurse Joe (Counts 5 and 6) be dismissed with prejudice, (3) Plaintiff's State law malpractice claim against Dr. Bujard (Count 8) be dismissed without prejudice, and **DENIED IN PART** with regard

to all of Plaintiff's other claims.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

Thus done and signed this 9th day of March, 2016, at Lafayette, Louisiana.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

COPY SENT:
DATE: 3/10/16
BY: ____
TO: R-D, Cg

28